Again, we'd invite counsel to take a minute, get settled at the counsel table, get your lectern wherever it is you need it to be, and Mr. Siminew, I understand that you would like to reserve three minutes for rebuttal. Did I say that right, Mr. Siminew? You nailed it, Your Honor. It's a good day. Thank you, Your Honors. And may it please the Court, Ben Siminew on behalf of the plaintiffs and appellants. Your Honors, Rule 702 was intended to exclude junk science. But here, the science supporting general causation was far from junk. There were seven epidemiology studies showing a positive statistically significant association between maternal use of serotonin reuptake inhibitors, or SSRIs, and autism spectrum disorders. In addition, there were reams of animal data establishing that early exposure to serotonin causes dysregulation of brain development. And more specifically, there was a model developed by Dr. Whitaker which demonstrated that the exposure to serotonin during those critical developmental periods in both the humans and animal model does result in altered brain development. And that study had been cited over 600 times in published peer-reviewed literature. Mr. Siminew, just to preface the argument that will follow from you and from your opponent, could you just clarify for us the standard of review? I don't think it's in dispute, but would you just tell us in your view what it is? Yes, Your Honor. I think broadly, the standard of review is abuse of discretion. I think within that, though, there are issues of whether or not the correct legal standard was applied, in which case, obviously, it would be an independent review or de novo review standard. And then there's also some factual determinations that were made here, embedded factual determinations, which would be subject to a clear error standard. So broadly, abuse of discretion, but within that, I think it's clear error or error is the standard. And it may become helpful then at different parts of each of your arguments, if you do agree on that overarching standard of review, to specify when we get to something that you think is a legal error or something you think is a factual error or something you think is covered by the umbrella of abuse of discretion. Sure, Your Honor. I'm prepared to do that exactly now, actually. Okay. So here, we think that the district court made broadly stated three specific errors when it decided to exclude plaintiff's experts. First, and this would, I think, be the legal error, Your Honor, is that the district court imposed a requirement that is both foreign to law and the laboratory when it demanded that plaintiff's experts quantify the weight that they put on each factor in their analyses. And cases including... Mr. Bradford Hill? Correct. Correct, Your Honor. And cases, replete cases, but including this court's recent decision in Sarkey's, confirmed that that's absolutely wrong. Could you just direct us to where in the opinion you think the court required that or merely discounted it for lack of an application of specific weight? Because arguably that could make a difference in our review, right? If the court said, you know, no one can ever give an expert report without giving a precise number to these things, that's one thing. But if the court discounted them and says, I don't even know what to make of this. You're not giving me any weight. How am I supposed to make heads or tails of it? That seems to be a different thing. So could you direct us to where in the court's opinion you think we see the operative language that will guide us into the choice of the proper standard of review? Sure, Your Honor. And I know that she's dealing with three different or different expert opinions, so maybe multiple points of opinion. Well, I think that it's replete throughout the opinion. I mean, it really is. It's sort of a... Give us some pages. Sure, I'll give you something pointed. The district court actually used the word quantified in special appendix page 32. I'm sure there's others. I know that it's implicit. I mean, it really is sort of a passive citation. I do want to push back, though. Hang on. Let's just get there. So you're at page 32. But I guess I'm trying to get to... She may have used the word quantified, but I guess that's... I want to dig deeper. So the question I'm asking is where do you suggest that she said as a matter of law one cannot even look at an opinion unless there's a quantification? I think that's implicit, Your Honor. In the court's repeated citations to the Moreno decision, I think that... And I was about to say, Your Honor, I sort of wanted to put... Which we affirmed. You did affirm, although I'm not sure that... For the reasons stated by the district court. That generally means that we're incorporating the holdings of the district court as our own. That's what that language means. We don't want to bother writing an opinion of our own, for lack of a word, not out of laziness, but out of respect for the district court. We're elevating the district court's opinion to the level of our precedent almost. Well, I think, Your Honor, it's true that courts... This court affirms all the time without necessarily... I mean, if there's three reasons that are advanced in the opinion, this court doesn't need to believe all three of them are accurate in order to affirm. When we say, though... That's a verbal formula. When we say substantially for the reasons stated by the district court, we are functionally almost elevating it to the level of our... Almost, not quite, but it's pretty close. Then if that's the case, Your Honor, I would submit that there is a split within this circuit as to whether or not that quantification is required, because in Sarkey's, this court said it was not. I'm sorry, just tell me again, and I hate to belabor this point, but I think it's an important starting point. Where, for example, on page 32, S.P.A. 32, do you claim that she said that this is a sine qua non of even looking at an expert quantification? She uses the word quantified specifically with reference to Dr. Plunkett. I know, I know, but using the word quantified, I'm saying... Did she say, because Dr. Plunkett didn't quantify, I won't even look at it, as opposed to saying, because she doesn't, it's not quantified, it is worthy of less weight or something. I'm just trying to find, where on page 32, for one thing, they don't have line numbers here. I don't know if you can count down and tell me what line you're looking at. I'm sorry. Sure, no problem, Your Honor. I'm not spotting it. That specific, obviously at the top, it's a section that's titled Bradford Hill Analysis. Yeah. And then that sort of large paragraph, if you go down to the fourth line from the end of that paragraph... Yeah, she explained that these cannot be quantified. So she's simply reciting what Dr. Plunkett said. Correct. And my point is that her emphasis on quantification and repeated emphasis throughout the decision on whether or not the expert put weight on a particular factor was... And she said very clearly, without doing this, we can't assess the reliability. But she didn't say that. Right? The quantification mentioned is her description of Plunkett's analysis. The next paragraph, where she rejects it, is where she quotes Murrain and says, the weight of evidence methodology is scientifically acceptable when experts rigorously explain how they have weighted. Nothing about quantification, about putting numbers. Well... I expect that quantification to be 32% here, 22% here. But even a narrative explanation of why one thing is recorded more or less weight or more or less important, I mean, I think it's true, in reliably employing a weight of the evidence methodology, an expert must thoroughly analyze the strengths and weaknesses of any inconsistent research sufficiently reconcile her opinion with contrary authority and says, without such explanations, the proper testimony cannot meet the reliability standards. I didn't read the district court as saying, I want numbers to the third significant digit. I read that as saying, you've given me a black box. Explain to yourself, why is one thing more or less valuable? So that is different from a claim that I don't think she said, that I demand quantification from you. So I guess let's just start there in terms of what you think the district court did, so that way we can argue how you apply the standard of review to it, because I think we're not necessarily on the same page about what the court did. We may not be, Your Honor, and I'll simply say one of the assumptions that I'm making is I'm not sure how you do this weighting without sort of an implicit quantification. I just don't know how you do that. I mean, was Dr. Moyet, for example, supposed to say, well, of the Bradford Hill factors, this is number one, this is number two, this is number three. I mean, and even if he did do that, how does that advance the ball here? I mean, it's sort of hard to imagine how you would do that in a way that's not sort of artificial. Don't we do that all the time? I mean, I'm just thinking, like, you know, the Polaroid factors, you know, when we're dealing with intellectual property. We go through the Polaroid factors and say this tips that way, this tips strongly this way, this is pretty weak, this is pretty neutral. It's kind of easy. It is, and now we are on the same page, because what I think we were supposed to do here is to say these are the factors that you should consider to differentiate causation from association and make it a binary analysis, as you just described. This factor goes in favor, this factor does not. No, that's not a binary analysis. We often talk about the weight of the factors. We'll say tips slightly. This one counts for more. This one isn't very persuasive in this case because there are gradations. When we do a Polaroid analysis, we don't flick it to zeros and ones and zeros and ones and add up the ones and add up the zeros. And that's true, John. Maybe to be more precise, you sort of say this factor cuts in favor, this factor cuts against, this factor cuts very strongly because of whatever reasons, and this factor is sort of weakly in favor. I understand that. Isn't part of the district court's decision here looking at the weight that the expert, let's take Dr. Moyer's opinion, and saying, look, you're ignoring studies entirely. You're cherry picking certain studies. So it was the court looking at the weight the expert is giving and saying, you're ignoring studies or you're attacking studies that go against your opinion for the reasons that you ignore and studies that favor your opinion. So the court is doing a review of the weight that the expert is giving and coming to the conclusion that it amounts to cherry picking and not reliable because evidence is being ignored. It's not a proper weighing of the factors. And how are we to find that to be an abuse of discretion? Very easy, Your Honor. I'm glad you went there because that's maybe the most glaring example of my second point, which is apart from the weight of the analysis, the district court also misapplied and misunderstood the science. And that's the best example. Dr. Moyer said, look, of all the universe of epidemiology, there's these seven studies that show an association strongly so, and there's some that do not. But all of the data has the same common denominator problem, which is misclassification bias, this compliance validation issue where the data is drawn from pharmacy records. The problem with that is many people don't fill the prescription, or if they do, they don't take it. But didn't the court say precisely on that point that Dr. Moy and the other, well, at least Dr. Moy, was willing to count that problem of noncompliance in studies that went, made the opposite conclusion of his in terms of causation, but was not willing to do the same thing for the studies he was relying on to support his conclusion that there was causation? Yes.  It's not the problem. A hundred percent of that happened, but it's not the problem, and here's why. When you take that into account, a study that shows a two becomes a 2.2. Or in a study that showed a .9 becomes a 1.1. It has the universal effect of elevating all of the data. I'm sorry, elevating all of the associations. Misclassification bias artificially suppresses the association. So it's like a rising tide. It lifts all the boats when you take that into account. I'm sorry, finish. I was going to say it's particularly significant here for a couple reasons. One is that the data was drawn from Europe, mostly, where the label deterred, cautioned against use during pregnancy. So this issue looms especially large with this data set. Number two, the data that shows supposedly no association were kind of wobbler findings. They were actually positive until you adjust for statistical association, and then they became sort of null findings. So this idea that everything is going to get pushed to the right is really profound here and has a completely dramatic effect on the universe of the science. And so it's not double talk or cherry picking to say, yes, misclassification bias is an issue in our entire data set, but it's sort of a one-way ratchet, and that's why it's not cherry picking. And that does demonstrate, I think, exactly the sort of misunderstandings and misapplication of science that tainted this district court's entire order. So, I mean, it seems to me part of – I'm stuck on a few doctrinal issues. I mean, it seems to me that we're in a – you're asking us to be in the business of line drawing, and so I'm hoping that you can let us know how you would articulate the line between the district court's gatekeeping role, which is under abusive discretion, which means it doesn't have to be perfect. I mean, we may have views on misclassification bias and the like, and when someone has actually asserted the role of the fact finder. I'm seeing a lot of quibbling with the decisions that the judge made, but not you actually explaining why this was an abusive discretion. When you're answering that question, I'm hoping you can help me situate where we think the hard look analysis goes to. Is that part of, in your view, under the Dauber test, or does it come under 702? Where does that part of the doctrine fit into what we're trying to figure out here? Sure, Your Honor. So the way I look at it is this. I think 702 gives us the factors that we must look at to assess whether or not expert testimony is admissible. I think it's only the third factor here about the reliability that's at issue, and then Daubert gives us factors that we might use to assess the reliability. It's not exhaustive. It's not a checklist, and we need to be creative and flexible. Where is the hard look analysis that you said she, like, is it in 702 or is it in Daubert? I think it derives from the idea that if you can't fit the case neatly into a Daubert box, then this hard look concept comes up. So it's in lieu of Daubert. It's not part of 702, in your view. I think that's how I would understand it. Okay, so if you could answer the first question, then, about the line drawing. Sure. But I want to go back to this point because I think it's a good example. You can't, under an abuse of discretion standard, say, well, you know, the district court had her opinion of misclassification bias and her understanding of it, and we can't really quibble with that, so we're going to leave that. I mean, it's just wrong. It's just an error, and you cannot, particularly in this realm, when we're supposed to let these things go to trial to resolve doubts, you can't just misunderstand something that's very fundamental to understanding this scientific picture here. So that is an example of an abuse of discretion. Okay, so we have to – you're saying that we have to rule on the rightness or wrongness of this misclassification bias? I think that – I mean, because there's a lot of things you had issues with that we weren't hearing presented ourselves, and you think that as a matter of deciding what we have to do, that we have to rule on the correctness or wrongness of all of them? No, I think that – I emphasize that one because that was sort of fundamental to the court's perception that there was cherry-picking going on here and also that the epidemiology picture, which actually the preponderance of it tilts very favorably for us, that it somehow actually cuts against. And so that is a fulcrum point on which this whole case turns. And I think it's also notable that my friends on the other side never said, oh, no, they don't understand misclassification bias. The district court got it right. They implicitly say, okay, that's fine. They're correct about that. But here it had only a minimal effect. And that gets us to a merits issue that, again, must be resolved at trial. Well, what if we concluded that there was a ton of cherry-picking done by Dr. Moyet and that, yes, maybe one little thing, hypothetically, let's say we agree with you on the misclassification issue, but we said he had absolutely no basis for rejecting a meta-analysis. Like, what's with that? I don't understand how he could just say, well, meta-analyses. I understand during his – I don't know if it was his rebuttal statement or his deposition. He said, well, the original analyses were not intended to be merged together. Well, that's nonsense, right? That's the whole point of a meta-analysis, right? As you go back, you look at the data generated in multiple independent studies. The person performing the meta-analysis determines whether you've got apples to apples. And if they are, then hooray, you merge them and you have a meta-analysis. But his response seemed to be non-responsive, right? Oh, it was never designed or intended to be put together. And the answer to that is, who cares what the intention was? Nobody intends to do a study beyond their study. The question is whether the meta-analysis performed by other people subsequently is in fact a valid meta-analysis. So why would the district court not be entirely justified in saying, you know, that's cherry-picking? He basically gave no good reason for ignoring other studies. And that seems to me – me, I'm saying district court – to be a clear case of cherry-picking. So as an example, you know, why wouldn't that, for example, if we agreed with it, be a perfectly suitable reason to affirm and find no abuse of discretion? Well, because I don't think that's entirely accurate as to his reasons for rejecting the meta-analyses. I think another reason, and maybe the predominant reason, was the one that we've just been discussing, which is the misclassification bias. Because his point is, you're now sort of taking all this heterogeneous data, which, in his view, has this very fundamental issue, and then you're sort of amplifying it by concentrating it. So it's really baking it in. Well, he didn't really say it's heterogeneous, though, did he? I believe he did. He did. But again, it's up to the meta-analysis. Is that heterogeneous in a material way? Yes, Your Honor. And the other point – And he didn't, I don't think, say why it's heterogeneous in a material way. Why it can't be put together. I thought his testimony was it wasn't intended to be put together or designed to be put together, which, again, seems to me to be completely not responsive to the question of whether, notwithstanding the a priori intentions of the original study authors, whether, in fact, the data is there, can be mined, and does, in fact, line up. Do you see what I'm saying? I do, Your Honor. I understand your point. Certainly at times I think Dr. Moyet was maybe more glib than I would prefer, but I don't think that it's accurate to say that he didn't have any good reason for looking skeptically at meta-analyses, especially because he did look at all of the source data on which those are based. So, in a way, the meta-analyses are sort of like their expert. It's another opinion. It's another learned person's opinion of what the whole picture shows. Well, it's by the EMA, which is, I would think, particularly, I mean, I don't want to say authoritative in the sense that someone's got to believe everything that comes out of their mouths, but, I mean, you would think that there would be some substantial weight that one would logically accord to such a view. And, again, they were willing to do the meta-analysis, and he seemed to be of the view that one just discards the question of meta-analysis. But a meta-analysis on its own looks for consistencies or inconsistencies among various studies and then draws conclusions from this larger pool of data. And he wasn't willing to do that. And that's done. Meta-analysis is done in a rigorous scientific way. And if he wasn't willing to do it, it's not like he did a counter-meta-analysis, right? And said, oh, no, no, look, I put all the data together in one big data set and look at the, you know, you plug more data into the equation, you get a different result from, you know, the EMA is wrong, that they did the math wrong or something. He didn't say that, right? He just said, no, don't listen to them. That's why I'm a little troubled by that. Well, I think he said we should be cautious about how much weight we put on the EMA's analysis because, I mean, contextual importance here that, again, the label in Europe already strongly discouraged the use during pregnancy, and it reserved it for only instances where it's clearly necessary. And so, you know, I think that that raises the standard for the EMA deciding we're going to declare this a cause of autism, which is going to have just a complete sort of black box effect on the use. And I think it's fair for the EMA to say, look, you know, the science isn't there for us to take that far of a step. The second point on the EMA analysis is that there were, and here I think it's ironic, there were meta-analyses subsequent to the EMA's report in 2016, which further showed a strong association between SSRI exposure and autism spectrum disorders. So, you know, the EMA report is a little bit outdated for the very reasons, for the very meta-analysis that you're describing, Your Honor, and that's something that Moy definitely emphasized in discounting that report. Well, let me say, we've kept you up considerably past your time. We appreciate that. We will have you back for three minutes of rebuttal. Why don't we hear from Mr. Wolfe? Thank you, Your Honor. May it please the Court, Orr Wolfe for the Forest Defendants. This Court's precedent, including that in Ammordiano-San Marino II, required Judge Swain to undertake a rigorous analysis and a hard look at each expert's methodology. This Court reviews those rulings under a highly deferential abusive discretion standard. Judge Swain's thorough and careful decision is a model of a district court discharging its gatekeeping duties. That ruling was well within the broad ambit of a district court's discretion and far from being manifestly erroneous. So can you tell me, though, where is the line between a hard look and asserting the role of the jury? And in some ways, her very thorough analysis actually cuts against your argument. I mean, so if you can help us figure out how we thread this needle. So respectfully, Your Honor, the words rigorous analysis and hard look are your words from Ammordiano's and from Marino II. And in Daubert, the Supreme Court emphasized that district courts must ensure that the expert evidence is reliable. And in- And all of that is not disputed. Can you give me an example of when you think- if you don't have an articulable way to help us line draw, can you give me an example of when you think something would be too hard of a look or too much having an opinion on the scientific conclusion validity or wading into the scientific debate? I'm really hard pressed to do that. If you take a look at what happened in Ammordiano's, this court said that it was commendable. Commendable was the word that this court used in describing the hard look given by the district court in that case. If there were instances, for example, where the district court explicitly evaluated the credibility of the plaintiff's expert or defense expert, that crosses the line and invades the province of the jury. Those kinds of questions are committed to the exclusive province of the fact finder. And then can you tell me what the role of cross-examination plays in terms of curing any potential junk science or the like? Sure. In Daubert, the Supreme Court was quite clear that you don't get the benefit of cross-examination until the expert evidence satisfies the requirement of Rule 702. And in the Nice against Ford Motor case, which we cite in our brief, the Fourth Circuit reiterated that point merely because testimony may be cross-examined, does not supplant the threshold preliminary review that the district court must make before that evidence has the benefit of being examined by cross-examination. And so a district court should not be faulted for rolling up its sleeves and doing what this court told district courts to do in analyzing Daubert motions. But the standard that the plaintiffs advocate here would nullify the court's gatekeeping role. Plaintiffs' arguments amount to a broadside attack against the required threshold scrutiny of expert evidence under Rule 702 and undercut that mandate's importance, which Justice Breyer so ably explained in Joiner. In Daubert, the Supreme Court recognized that general acceptance is a factor in bearing on reliability. In Marina II, this court likewise held that a district court is well within its discretion to consider whether the plaintiff's expert's conclusions were generally accepted by the scientific community and that the district court does not abuse its discretion in doing so. And in Marina II, the expert was also Dr. Moye. Dr. Moye and Dr. Plunkett as well. And there the court found that the reason it wouldn't accept the testimony was because of his failure, Dr. Moye's failure to consider known contrary evidence. So similar basis. I know it was a different medicine or a different medical treatment, I should say, and whether it caused idiopathic intracranial hypertension. But the reason for rejecting the same expert in that case was the failure to consider basically other known contrary evidence or studies. Yes, Your Honor, that's correct. Among other things. I mean, I think it's notable that, you know, Drs. Moye and Plunkett submitted their reports in our case before Judge Engelmeyer issued his opinion in Marina II. And both Dr. Moye and Dr. Plunkett, as plaintiffs indicate in their brief, are experienced witnesses. It's no surprise that from one case to another, they take similar approaches. So the approach that the district court and this court found infirm in Marina II is evident in this record as well. And Judge Swain correctly recognized and plaintiff's experts admitted that while this issue has been studied for years, no regulatory agency, no professional organization, no medical treatise, and no published study has found that SSRIs cause autism in offspring. And general acceptance is only one of the doubert factors. And I think it's, you know, significant here that in Amorgianos, this court held it is critical that an expert's analysis be reliable at every step. And similar to the methodological infirmities in Marina II here, there was a failure to meet any of the four doubert factors for Drs. Moye and Plunkett. Can I just bring you back to a question I was asking your colleague? And I'd like to ask this in one of you. It was one of his arguments about faulting the district court for, in his view, the district court having required or faulted the experts for not specifically quantifying the amount of weight given to each of the Bradford Hill factors. Could you give me your view on what the district court did in that respect? And in terms of what it was requiring to be shown in order for reliability to be there, or perhaps better, what it was faulting the expert opinions for in that respect? Just what's your view of what the district court did? Yes, Your Honor. So in the Zoloft case, the Third Circuit, and in Marina II, the Southern District, and this court indicated that when one uses a weight of the evidence or a Bradford Hill analysis, it is important for the expert to describe how much weight he or she is putting on the various factors. Here, Dr. Moyet did not distinguish, did not explain how much weight he was putting on one factor as opposed to any other factor. So it was impossible for the district court or for any other expert to vet that work, to test it, to see if it was reliable, to see if it could be replicated. It can't be replicated when it's not explained. So that explanation was wholly lacking in this case. And again, what Judge Swain found was that there were multiple instances of standard misapplications of the cited methods, including the Bradford Hill factors. There were multiple instances of cherry-picking studies. There were multiple instances of disregarding the limitations that the researchers in the field have expressed in their peer-reviewed papers. There were multiple instances of weighing the evidence subjectively and inscrutably. There were multiple instances of analytical gaps between the data and the opinions being proffered. And there were multiple instances of categorically ignoring relevant literature, including scientific reviews or meta-analyses. Any of those methodological errors would have been sufficient to survive an abuse-of-discretion review, and here we have all of them. Cum Ho Tire instructs that a district court enjoys the same broad latitude in determining how to assess reliability as it does in its ultimate reliability determination. That is, when it decides whether or not an expert's testimony is reliable. There was no abuse-of-discretion here. Judge Swain's well-reasoned decision should be affirmed. Unless this court has further questions, we respectfully leave the balance of our arguments to our brief. Thank you very much, counsel. Mr. Siminoff, you have reserved three minutes for rebuttal. We kept you up considerably in the beginning, so we'll just keep it to three minutes. Thank you, Your Honor. I want to jump in on this issue that Your Honor asked about, cross-examination and the role that it plays. And ironically, I actually think the answer lies in the Miranda decision, the district court's decision, at pages 248 through 249. And what's very interesting about that passage is the district court there said, well, Dr. Moyet didn't put any weight on the Bradford Hill factors, and so it's impossible, it's a black box, and nobody can untangle this and figure out how he drew the conclusions he did. But then the district court went through, and I won't read it here, I really do encourage the court to take a look at it, though, where it said, a fact finder might wonder, you know, you put high strength of association, Dr. Moyet, but, you know, one of your studies that you rely on says we're not going to say that there's causation here or there's confounding variables here, and therefore, a finder of fact might not think the strength of association is as strong as you suggest. And then going to, you know, other factors might have concerns about some additional factors, and then when looking at the totality, saying you put this here and you put that there, but we don't think that they're as strong as you say, they might distrust his opinion. And then it says, and this is impossible to do here. And my point is, that's a perfect illustration of how this is supposed to go, both at the reliability stage and at trial. We know the universe of factors that we're supposed to guide our analysis, and the expert says, I think this factor applies, maybe strongly or sort of, and here are the reasons and here's the support for that, and that's it. And to require more than that is not only contrary to this circuit's precedence, it's exactly contrary to how this is done in their day-to-day jobs, which in Kumho-Tyre, the Supreme Court said is certainly relevant to the analysis. You know, in terms of hard look, I think we've talked about that phrase, and I do agree that it's a little bit ambiguous what it means. I think the Amor-Guianos case from this court, at page 266, where it basically says, the question is whether the studies are adequate to support the conclusions reached. That's the same sort of definition that the First Circuit gave in Millward and the Eighth Circuit in the Kuhn case, all of which we've cited. And then I want to touch on Morena a little bit. I know that it's unfortunate Dr. Moyet and Dr. Plunkett were involved there. I do think, actually, counsel's point sort of cuts in our favor that this rigorousness or hard look, which I think we all agree is nebulous, sort of got ratcheted up a little bit in the Morena District Court decision, and maybe if they'd had the benefit of knowing, okay, the high jump is a little higher now, we need to prepare it accordingly, maybe things would have been a little different here. But I do want to stress before I sit down that Morena was a very different case. You had an extremely rare disease. You had two epidemiology studies showing an association, one of which was recounted by the author, and then you had five showing absolutely no association whatsoever, and then there was zero animal data to support this biologic plausibility in this model. So I realize they're the same experts, but the picture there was completely different. And so to suggest that, well, any time Moyet and Plunkett stand up, no matter what the science looks at underneath them, their opinions are out, I think is just not right. Thank you very much to both counsels. Thank you. It was very well argued. Thank you. We will take the case under advisement.